Filed 3/13/24  Gonzalez v. Hettinga Transportation CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RICARDO GONZALEZ et al., | F083948 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. VCU277573) |
| HETTINGA TRANSPORTATION, INC., | **OPINION** |
| Defendant and Respondent, | |
| ZENITH INSURANCE COMPANY, | |
| Intervenor and Appellant. | |

APPEAL from a judgment of the Superior Court of Tulare County.  David C. Mathias, Judge.

Ball, Bonholtzer & Evans, Stephen C. Ball; Law Offices of James B. Kropff, James B. Kropff, for Plaintiffs and Appellants Ricardo Gonzalez et al.

Chernow, Pine and Williams, Jeffrey J. Williams, for Intervenor and Appellant Zenith Insurance Company.

Horton, Oberrecht & Kirkpatrick, Kimberly S. Oberrecht; Gordon & Polscer, Brian C. Hickman; Sagaser, Watkins & Wieland, William M. Woolman, for Defendant and Respondent.

-ooOoo-

In this negligence case, involving questions, among others, about the standard of care and causation, the trial court granted nonsuit.  Judgment was entered in favor of defendant and this appeal followed.  We reverse and remand with directions for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, and for several years before, Ricardo Gonzalez (Gonzalez) worked at AC Enterprises, a dairy operation in Tipton that was owned and run by Carl Brasil.  This case arose out of an incident that occurred in the early morning hours of April 29, 2017, at the AC Enterprises dairy when Gonzalez, as part of his job duties, dislodged bales of hay from a haystack to feed the cows at the dairy.  The night before the accident, Hettinga Transportation, Inc. (Hettinga), a company based in Pixley, had delivered the hay by truck to the dairy; Hettinga employees had unloaded and stacked the hay upon delivery. After Gonzalez downed a few bales of hay from the stack in order to process the hay and feed it to the cows, other haybales toppled onto him, grievously injuring him.

On February 28, 2019, Gonzalez and his wife, Hortencia Gonzalez (plaintiffs), filed the complaint initiating this matter against Hettinga, the defendant.  The complaint alleged two causes of action:  negligence and loss of consortium.  As to the negligence cause of action, the complaint alleged that on April [28], 2017, Hettinga delivered and negligently stacked haybales at AC Enterprises such that once Gonzalez subsequently dislodged bales of hay from the haystack to feed the dairy cows, other haybales fell on him and severely injured him.  The complaint also alleged a claim for loss of consortium on behalf of Gonzalez's wife, Hortencia Gonzalez.

As for remedies, with respect to the negligence claim, the complaint sought damages resulting from the accident, including damages for past and future medical expenses, wage loss, and impaired future earning capacity.  With regard to the loss of consortium claim, the complaint similarly sought monetary damages.

2.

On August 8, 2019, AC Enterprises' insurer, Zenith Insurance Company (Zenith or intervenor), filed a complaint-in-intervention against Hettinga. Zenith's complaint-in-intervention sought to recover from Hettinga—assertedly a potentially liable third party—worker's compensation benefits paid by Zenith on Gonzalez's claim after he was injured at work at AC Enterprises.

The case proceeded to jury trial on December 1, 2021, in the Tulare County Superior Court. On December 2, 2021, Hettinga filed a motion for nonsuit arguing that the work-completed-and-accepted doctrine was applicable in this matter and precluded any negligence claim, because when the haystack toppled and injured Gonzalez, it had already been accepted by AC Enterprises and was no longer under Hettinga's control. The court reserved ruling on Hettinga's nonsuit motion until the close of plaintiffs' and intervenor's cases-in-chief (both of which proceeded concurrently).

## I. Trial Evidence in Plaintiffs' and Intervenor's Jointly-Presented Cases-in-Chief

### A. Trial Testimony of Steve Hettinga

Steve Hettinga, Vice President of Hettinga Transportation, Inc., testified in plaintiffs' and intervenor's concurrent cases-in-chief. He described his company as follows: "[I]t's a trucking company. We purchase dairy commodities, products, sell them to other dairies and, um, we transport it." Hay was one of the commodities handled by Hettinga and the hay business comprised "50 percent" of Hettinga's business.

Steve Hettinga confirmed that Hettinga had delivered alfalfa hay to Carl Brasil's dairy in April 2017. The bales of hay delivered to Carl Brasil's dairy in April 2017 measured "3 by 4 by 8" (three feet by four feet by eight feet). Bales with these dimensions are referred to as "big bales," and each big bale weighs "1100 pound[s] or more" on average. Hettinga had picked up the hay that was delivered to Brasil's dairy, from White Mountain Ranch in Nevada. The hay was transported on a truck with a "flat deck" and an additional flatbed trailer behind the truck. Hettinga employee, Bobby

Maestaz, drove the Hettinga truck. A total of 45 big bales were delivered to Brasil's dairy; the 45 bales had an aggregate weight of 52,200 pounds or 26.10 tons. Hettinga employee and hay squeeze operator, Greg Brinkley, met the truck upon its arrival at Brasil's diary, and unloaded and stacked the hay using Hettinga's hay squeeze (a "squeeze" is a motorized loader that is used to unload bales of hay from trucks and to stack them). The delivery and stacking occurred on the evening of April 28, 2017.

Intervenor's counsel and Steve Hettinga had the following exchange regarding the unloading and stacking of the big bales:

"Q. All right. And, um, what training, if any, did Hettinga Transportation provide to Greg Brinkley, um, with regard to whether the hay is stacked in this case on the 4-foot side or the 3-foot side?

"A. I'm sorry. Say it again.

"Q. Did you provide Mr. Brinkley with any training on whether to stack the hay on the 3-foot side or the 4-foot side?

"A. Um, it would be training as to what is safe and what is not safe.

"Q. Okay.

"A. And that would be something that we would be training him to say – or not sa[y] but training him to do and not say to be on a 3-by-8 edge [*sic*].

"Q. So Hettinga Transportation trained Mr. Brinkley to not stack the hay on the 3-foot edge because it would be dangerous?

"A. Correct.

"Q. Okay. And why would it be dangerous?

"A. They could fall.

"Q. Okay. The, um, training that you provided to Mr. Brinkley on whether to stack the bales on the 3-foot or the 4-foot side, did you follow that up with any recurrent training?

"A. I mean, there's – the training is just pretty much we talk to each other, I guess you could say. It's a verbal – nothing like we're doing exercises. I

4.

just would make sure that [it's] not being done, whatever, that way, he never did it that way.

"Q. And how do you know that?

"A. I've never seen him do it that way. [¶] … [¶]

"Q. Okay. Did Hettinga Transportation provide Mr. Brinkley with any training or instruction on how high and tall he could stack the hay that he was unloading on your customers' property?

"A. No.

"Q. And, um, what did Hettinga Transportation consider to be a safe height, if any, for hay bales?

"A. Um, the – whatever was on the truck.

"Q. Okay. So if, for example, on the truck they were stacked on the 4-foot side three high – okay? We saw a picture of a truck this morning. [¶] Do you recall that?

"A. Correct.

"Q. Um, that's 9 feet tall. My math is correct; right? [¶] … [¶]

"A. Okay. Yes.

"Q. Right. It would be three bales 3 feet high [each] stacked on the 4-foot side is 9 feet?

"A. Correct.

"Q. And so if it's pulled off of the truck at 9 feet tall and placed on the ground 9 feet tall—

"A. Correct.

"Q. – that's a safe height for Hettinga.

"A. Correct.

"Q. On the ground. Anything taller than that is not safe? [¶] … [¶]

"A. I'm not 100 percent sure exactly what somebody considers safe and not. So I really – I couldn't answer that.

5.

"Q. So I think you mentioned a moment ago that Hettinga Transportation considered a safe height to be whatever the height of the bales [was] on the truck….

"A. Yes.

"Q. Okay. So what's the maximum height you could put on the truck?

"A. Um, it would be 10 feet. [¶] Like the top, like, when it's on the truck?

"Q. Yes.

"A. Fourteen feet.

"Q. Okay. I'm sorry. On top of the flatbed.

"A. Yeah. Well, the top of our flatbed is a 3 feet – little over 3 feet tall or something like that. 3½ feet. And so that 14 feet minus that 3½ feet, so whatever that would be.

"Q. Ten to 11 feet, something like that?

"A. Right.

"Q. So if the hay was stacked on a customer's property at a height in between 10 to [11] feet –

"A. Uh-huh.

"Q. – that would be within Hettinga Transportation's expectation about a safe height?

"A. The feet I really can't say because it all depends on how the bales are configured. If they weren't in a safe manner, then 3 feet is too tall."

Steve Hettinga noted that Greg Brinkley had been unloading and stacking hay since Brinkley was a teenager and he was now retired, so Brinkley was a veteran at the job when he unloaded and stacked the hay in April 2017 at AC Enterprises.

Hettinga's paperwork regarding the hay delivery to AC Enterprises in April 2017 showed that Lorenzo Ocampo, an employee of the dairy, signed off on the delivery.

6.

Steve Hettinga testified: "Mr. Ocampo's signature indicates that [the load] was received in good condition."

Steve Hettinga observed he first heard about the accident involving Gonzalez sometime in 2019, two years after the accident had occurred. The first news came via a letter from Gonzalez's attorney. Hettinga had continued to sell hay to Carl Brasil's dairy well after April 2017 and had only recently stopped doing so.

### B.      Trial Testimony of Robert Maestaz

Robert Maestaz, who had driven trucks for 30 years including for nine years for Hettinga, testified at trial. With regard to the delivery to AC Enterprises in April 2017, Maestaz picked the hay up at White Mountain Ranch in Nevada on April 27, 2017, and delivered it to the dairy on April 28, 2017. Maestaz did not remember making that particular delivery to AC Enterprises. Maestaz confirmed he had no recollection with respect to the loads at issue or the configuration of the bales that comprised that delivery.

Generally, with a hay delivery, Hettinga's hay squeeze operator, Greg Brinkley, would tell Maestaz "where to park and drop the hay" at the delivery point. Typically, hay bales were stacked on the truck in nine-foot-high columns (that is, the bales were stacked three bales high, with each bale resting on its wider, four foot by eight foot side). The hay would be taken off the truck and then stacked on the ground outdoors or in a barn in the same configuration as had existed on the truck. Thus, when Maestaz brought hay to a delivery site, Brinkley would "regularly" stack the bales in columns that were three bales high (nine-feet high overall), with the bales resting on their wider, four foot by eight foot bases (stacking bales on their wide or flat bases is referred to as stacking them "flat"). The bales would be taken off the truck in batches of two columns, comprising a total of six bales, at a time. Maestaz was asked by plaintiffs' counsel: "When Mr. Brinkley takes the hay off the truck into the yard, the dairy yard, for instance, does he ever stack it higher than three bales?" Maestaz answered in the affirmative, indicating that Brinkley would follow any specific instructions from the customer. Maestaz had seen Brinkley

7.

stack bales as high as "[s]ix high with another six high on top"—in other words, 12 bales stacked *flat*, to a total height of 18 feet—in a spot designated by the customer, in special circumstances.

In the case of the April 2017 delivery to AC Enterprises, the load comprised of 45 bales. Maestaz initially indicated the bales were stacked in columns that were three bales high, with seven columns or 21 bales on the truck and eight columns or 24 bales on the trailer. The hay bales were picked up from White Mountain Ranch. Maestaz said he had picked up loads of 45 haybales from White Mountain Ranch "[l]ots of times" before April 2017, and "[e]very single time" the bales were loaded onto the truck and trailer in seven and eight columns respectively, with each column being three bales high.

Subsequently, on examination by Hettinga's counsel, Maestaz changed or modified his testimony. Maestaz indicated he had picked up hay from White Mountain Ranch "[p]retty often" before April 2017, and their hay would "[p]retty much" always be configured as "four high flat." Maestaz explained that "four high flat" meant the haybales were stacked on their four foot by eight foot surfaces, that is, they were wide side down, in four-bale-high stacks. Maestaz was asked by Hettinga's counsel: "When you would go to White Mountain Ranch to pick up hay, did they ever cross-bale it? Cross-tie it?" Maestaz answered, "No." Counsel next asked Maestaz: "Was it always in the same fashion every time you got there?" Maestaz responded, "Yes." Maestaz testified that the trailer was "8-foot wide" and approximately "4 feet" off the ground, and the maximum legal height of the truck/trailer and its load was 14 feet.[1]

---

[1] To the extent Maestaz testified the haybale stacks from White Mountain Ranch were "four high flat," the height of each stack would be 12 feet. The 12-foot-stack height, coupled with the truck bed/trailer bed height of four feet, would exceed the 14-foot maximum height referenced by Maestaz.

8.

### C.  *Trial Testimony of Greg Brinkley*

Greg Brinkley was retired at the time of trial, but he had worked as a squeeze operator for "[p]robably 20 years"; prior to retiring, he worked for Hettinga for eight or nine years.  Brinkley did not remember the hay delivery to AC Enterprises in April 2017 and could not say how he had stacked the bales on the day in question.  Brinkley knew Carl Brasil; typically, Carl Brasil wanted his hay stacked "[t]hree high."  Brinkley could usually unload a load of 45 haybales in "[a]bout 15 minutes," unloading two columns of haybales at a time.  The highest Brinkley had ever stacked haybales, at the behest of a dairyman, was eight bales high in a barn.  As for stacking outdoors, Brinkley observed: "Usually if you [un]load it outside, they're going to feed it right away, so you just set it off three high."

Brinkley described how a hay squeeze works:  "They got two rams [forks or clamps] on the bottom, and they open up, and you go in and clamp – excuse me – clamp the six bales and pick it up and go wherever you're going to put it."  Brinkley said the rams or clamps could go out and back in but they could not rotate.  Brinkley explained that in offloading a truck with a typical load,[2] he would clamp six bales—that is, two columns of three bales each—with the squeeze and simply set them down at the desired spot.)  Then he would "open the forks and do it again."

Brinkley stated that if the load on the truck was configured with the bales resting on their four foot by eight foot surfaces, he would set them down in the same configuration upon unloading them; it would take much longer to rearrange them to sit on their three foot by eight foot surfaces instead, so there was no incentive to do so.  Brinkley added:  "White Mountain put [the bales] four high, and they set them on [the wide edge so each bale was] three [feet] high.  And there's nobody going to do any extra work for free."

---

[2]  Brinkley was referring to a photo of a typical truck/trailer loaded with haybales that he was shown by Hettinga's counsel.

In the course of his testimony, Brinkley was asked: "[I]n [the] 20 years [that you worked as a squeeze operator,] did you gain an understanding of how dairy workers would take down the bales of hay after they had been stacked?" Brinkley responded: "Depends on what dairy you're talking about." Brinkley was then asked a follow up question: "Carl Brasil's dairy, for example?" Brinkley answered: "Pushed it down [with] the loader."

### D.     Trial Testimony of Carl Brasil

Carl Brasil had worked in the dairy business from a "young age," well before he was a teenager. Brasil "received a bachelor's of science degree in mechanical engineering" from Fresno State but continued to work in the dairy business. Gonzalez worked for Brasil for six years. On the early morning of Saturday, April 29, 2017, Gonzalez was injured in an accident at the dairy that occurred in connection with the hay delivered and stacked by Hettinga the prior evening (around 5:00 p.m.). At the time the dairy had a total of about 1700 animals, including both calves and mature cows. Brasil had ordered the hay from Hettinga to feed his cows (the purchase price included the cost of delivering and stacking the hay at Brasil's dairy). Brasil was pretty much out of hay at the time, so the hay would be used immediately upon delivery. Brinkley did not ask Brasil where or how to stack the bales, or to inspect the hay once it was stacked.

The bales delivered by Hettinga in April 2017 measured three feet by four feet by eight feet, with each bale typically weighing 1200 pounds. Once hay was delivered to the dairy, Brasil's workers would use a Caterpillar bucket loader to "knock down the hay to cut it" (each bale was tied up with poly twine). More specifically, Brasil explained: "Once it's delivered, all I had to unstack the hay was a wheel [or bucket] loader. Um, that doesn't have a clamp that's made – it's – you know, it's a bucket to scoop dry or loose-ingredient feed. But you can use it to manipulate a haystack and, you know, topple it down to the ground so that, you know, you can then scoop[] it up for – cut the – you know, the twine that holds it back together. Then it opens up and then you can scoop it

10.

up.  But that was the only thing I had on the dairy to – to feed the – you know, sufficiently feed the cows these bales of hay with."

Brasil further explained that, upon knocking bales down from the haystack, his workers would cut the twine holding the bale together, they would then scoop up the disaggregated bale with the bucket loader and dump it into a "processing tub" called a "mixer wagon," which would process the hay into "inch and a half" pieces to make it easier for the cows to eat.

Brasil testified:  "Approximately two to three weeks before the incident, [Gonzalez] went from [a] milker [position in the milking barn] to [working] outside and feeding the animals rather than milking them."  The change in jobs was a promotion.  Brasil personally trained Gonzalez for the feeding position.  Brasil stated:  "[T]he training is the most intense training I've ever done with anybody.  Um, it was side by side, um, throughout the whole day workday, eight hours side by side making sure that – you know for two to three weeks prior to the accident, making sure that he understood, you know, all the, you know, nuances of the new job.  Because it was a lot, you know, different from his old role.  His old position."  Brasil added:  "[W]e were both up together at 5:30 in the morning, and we would finish at 1:00 or 1:30 in the afternoon.  And, like I said, I never left him, um, alone for those first two weeks … I would call it a very intense training."  Among other things, the training addressed how to unstack bales of hay.  By the end of the training Gonzalez would be alone in the cabin of the loader and Brasil would "monitor his performance from the ground."  Big bales were the most common type of bales at the dairy and were always stacked "[o]n the 4-foot side."

Brasil described how he would deploy the bucket loader to dislodge bales from the haystack when they were stacked, per normal, on the four-foot side:  "I would either approach it with the bucket and, you know, put – because the bucket will put a lot of pressure or force, and I would try to … [p]ut pressure like this and try to, you know, back – backpedal the loader to try to topple, or I would come in from a corner and try to push

11.

it and topple. Whatever the loader would reach. I would say between the third, second, and try to topple it that way." The maximum reach of the loader was 12 feet.

Brasil noted that his stacks were usually cross-tied or tied: "Two stacks parallel to each other on the bottom then 90 degrees to that on the next layer." He added: "That's what we call the tie." In unstacking a tied stack, one would have to change one's orientation when toppling over each layer. Brasil explained: "But it's just a little bit stronger. I mean, it's, you know, a little bit safer, stronger." Brasil continued: "They don't topple as easily when you're not trying to manipulate them. First, I mean, if anyone's played Jenga, the tie – I don't know if we want to get into the physics of why it works. When you tie them like that, you know, it helps [a lot]." Brasil noted that when hay was brought in by truck, rather than on specialized equipment, it was usually not tied (although it would nonetheless be stacked "flat"). If the hay was to be stored for a long time, Brasil would ensure it was stacked in a tied configuration but not when it was going to be used immediately. Brasil stated: "And I'll tie my own hay. If you know you're going to store it for long period of time, you usually tie it. Take your time." The Hettinga hay was intended for immediate use.

At 6:30 a.m. on the morning of Saturday, April 29, 2017, Brasil headed out of his house, jumped in a little golf cart he used to travel around his property, and proceeded to drive through the dairy. He testified: "And I noticed something, peculiar about the feed area … because that was some of the only activity that was going on that morning. And I noticed that, um, the equipment was parked, and I didn't see [Gonzalez], you know, on foot or in the tractor – in either of the tractors. I really couldn't locate him. [¶] So, um, when I drove closer, I noticed that he was on the ground, um, between a few of the hay bales with his eyes closed with blood – dried blood covering his face." The hay was stacked near him, mostly on a dirt surface, but partly on a concrete surface. Gonzalez was lying faceup, on the concrete and was unconscious. Gonzalez was the only person working on the haybales that morning. Moreover, since it was a Saturday, Brasil was the

12.

first person to encounter Gonzalez at the scene of the accident. The loader, with its bucket empty, was idling; similarly, the mixer was empty and idling.

This encounter was the first time Brasil saw Gonzalez that morning; it was also the first time Brasil saw the hay that had been delivered by Hettinga the night before. Brasil estimated the hay was delivered at 5:00 p.m. the night before and so had been on his property for approximately 13 or 14 hours when he saw it. Brasil initially "thought [Gonzalez] was dead." He could see that Gonzalez's legs were "really damaged." When Brasil called Gonzalez's name, Gonzalez responded stating "everything's fine and he wanted to continue doing his job." He said there was a problem with his legs and asked Brasil to "help him back onto the piece of equipment" so he could finish his job. Brasil testified: "I could see his legs, and I could tell that they were – like, past the kneecap, they were in a position that was not normal. They were [both], you know, contorted to one side … it was not a normal position." Brasil immediately called 911 and Gonzalez was soon taken away in an ambulance.

Brasil described the scene of the accident with reference to a rough diagram he had drawn for investigators from the Occupation Safety and Health Administration (OSHA), which investigated the accident shortly after it occurred. (Ex. 451; attached to this opinion as Appendix A.) The hay was stacked in multiple rows of two columns each: each column consisted of a stack of four bales of hay. Gonzalez was lying *on the ground* at one end of the haystack, about 15 to 20 feet in front of the left-hand column of the row at that end of the haystack (that is, the end closest to Gonzalez). Both the right- and left-hand columns in that end row, that is, the row closest to Gonzalez, had only one bale remaining. Three bales were on the ground, to the right of the right-hand column of that end row; the twine on these three bales had been "cut and pulled" and they were "ready to be fed [into the mixer wagon]." Three *other* bales were lying in front of the left-hand column of that end row, around and partially above (but not touching) Gonzalez's body; these three bales were untouched and were still "wrapped with twine."

13.

Brasil was asked to describe, with reference to the diagram, the position of the three bales surrounding Gonzalez as he lay on the ground. Brasil stated: "So when I came up, um, I found his body in between two bales, and then his head was here, and his feet were there. And this one was wedged like that …. [The bales] were 6 to 12 inches above." The bucket loader was idling to the left of the left-hand column of the end row (that is, the row closest to Gonzalez's body). Gonzalez was lying in front of the left-hand column of that end row, more or less in line with the bucket loader, which was further to the left.

Brasil had noted, on the diagram he made for OSHA, the dimensions of the haybales in the columns comprising the haystack. Asked to explain the dimensions he had noted, Brasil testified: "Um, that's just showing dimensions of [each] bale when I found them as far as the stack. And, you know, when you approached it looking at that call, it was 8 foot, and it was sitting on a 3-foot base and then 4 foot high." (Ex. 451.) In other words, it was stacked on the narrow end. Brasil was then asked: "On Exhibit 451 … there appear to be more bales shown on here behind the two front bales…. [¶] Talk to us about those." Brasil responded: "Those were the rest of the load. Um, and they were in two columns, and they were stacked on the 3-foot end four high, so that would be 16 feet in the air. And, I mean, I didn't count them … that day, but if we take the load count, which was roughly 45 to 50, and in two columns … each face [or row] contained eight bales." Brasil added: "So if we divide that out, I think it was five or six faces [or rows]." In other words, looking at the scene post-accident, the end row closest to Gonzalez's body had two columns that were only one bale high each, and behind that row were five or six other rows with two columns, each four bales high.

After Gonzalez was taken away in an ambulance, Brasil turned to the task of feeding the cows. Brasil first turned his attention to the three bales that were around Gonzalez's body. One was not quite on the ground, so Brasil maneuvered it until it rested safely on the ground. He then "cut" those three bales and dumped them, along

14.

with the three other bales that had already been "cut," into the nearby mixer wagon and fed the resulting mix to the cows.  Over the next few hours and days, Brasil proceeded to take down the remaining columns of haybales until all the hay was used up.

Brasil described his experience in handling the haystack:  "Well, that day immediately – the first time that I handled the hay with the loader, um, after Mr. Gonzalez had left the scene, um, I noticed that [the] hay was, um, very sticky.  And one face or – wanted to stick to the other face, the back of it.  It was just like it had been mated with each other for a very long time.  So I  -- and then I had hindsight of Mr. Gonzalez's accident.  So I just proceeded with extreme caution while – while maneuvering the bales."

Brasil was asked:  "Did you notice any instability in the hay when you were personally taking down the hay bales?"  Brasil answered:  "Well, the first time I tried to manipulate, it must have only been um, an hour after, um, Mr. Gonzalez had left in an ambulance.  I had to essentially do the same thing that Mr. Gonzalez had to do with – and by that I mean drive the loader and rip off a layer of the bales, because the loader, like we said, was the only tool that we had on the dairy to, um, you know, bring these bales down to ground height so we can cut them and feed them."  Brasil continued:  "And what I noticed was, um, after I tried to rip a layer off and I was, um, -- I was toppling the outermost layer, I noticed that the layer behind that, um, was leaning.  And what I did, um, was I kind of jerked the wheel of the wheel loader to create momentum so that, you know, they would separate.  Like, create an [opposite] reaction so that they would separate.  And they did, but I had the hindsight of, you know, Mr. [Gonzalez] and the accident, so…."

Brasil was asked, in light of all the hours he spent working with that haystack in the days following the accident, whether he had any doubt in his mind at all that the bales were stacked on their three-foot sides and not their four-foot sides?  Brasil responded: "There's no doubt [they were] stacked on [their] 3-foot side[s]."  Brasil was further

15.

asked: "Based on what you observed when you found Mr. Gonzalez lying on the ground, was there any limitation that you saw in the area where the hay was stacked that would have prevented the hay from being stacked as low as two high instead of four?"  Brasil answered:  "No."

A couple of months after the accident, Brasil was contacted by OSHA, which was investigating the accident; Brasil submitted a report to the agency.  In the report, Brasil wrote that Gonzalez "separated hay bales from a stack to ground level, so he could cut twine around [the] bale."  Brasil added in the report that Gonzalez " 'created a lean on some of the bales left in the stack,' " and " 'when he went to cut the bales on the ground, the stack fell and the bale hit him.' "  Brasil further explained in the report:  " 'The root cause of this incident was poor hay stacking by the trucking company.  The bales should have never been stacked in the position in the extreme height.' "

Brasil noted that, following the accident, he stopped using the bucket loader to dislodge haybales from haystacks, at his dairy.  Rather, he switched to a "whole different loader," with a "different attachment."  The new loader was a squeeze-like machine with forks for picking up bales and moving them more safely.

### E.      Trial Testimony of Frank Ricardo

Frank Ricardo was the manager of the fields surrounding Carl Brasil's dairy, where he had worked for approximately six years.  Ricardo was working at the dairy on the morning of April 29, 2017, when the instant accident had occurred.  Ricardo explained:  "I was driving in when I seen Carl talking on the phone, and I had to stop by to talk to him and seen [Gonzalez] [lying] there."  Ricardo added:  "I seen him there. And I seen hay around him.  And I knew something had happened.  You know, and the more I stood there and looked at him, I got kind of wheezy.  And so, of course, I could hear paramedics coming in, so I wanted to get out of the way.  So I left."  Ricardo basically remained on the scene for "[f]ive minutes."

16.

Ricardo noted that some of the bales on the ground appeared to have been "cut," while others "seemed like they weren't cut" and remained tied up (those closest to Gonzalez were tied up). Gonzalez was lying 15 to 18 feet from the haystack; the bucket loader (with its bucket lowered) was a little closer to the stack, "[a]bout 10, 15 feet" from it. The loader had a "[v]ery sturdy" cover over the driver's seat (the import of this testimony was that the fact the driver's seat was protected indicated that bales from the stack did not topple onto Gonzalez while he was sitting in the loader).

Ricardo said he remembered how the hay was stacked that morning: "It was stacked upright." More specifically, the bales were stacked resting on their three-foot-sides and were stacked "[f]our high." Ricardo had worked in the dairy farming business for 45 years; he had stacked hay himself and had previously worked unloading hay trucks for a farmer (a long time ago). He had seen hay stacked in the same "[u]pright" configuration only once before. In this case, Ricardo observed, "apparently, looked like [Gonzalez] knocked bales down and then the other ones came down afterwards." Ricardo, who had personally stacked hay at times, said he considered the configuration of the haystack to be "[n]ot safe."[3] Ricardo did not take a photo of the haystack at the time.

### F.     Trial Testimony of Lorenzo Ocampo

Lorenzo Ocampo was at the dairy when the Hettinga hay was delivered in April 2017, and he signed off on the delivery. When Ocampo signed for the delivery, he could not even see the stacked hay. Ocampo did not work with hay and had no other role in connection with the delivery. When Ocampo subsequently saw the stack, he noted the bales were stacked four high; the bales were stacked on their three-foot edges. The stack was not leaning; rather it looked "[n]ormal like always."

---

[3] After Ricardo gave this testimony, the trial court sustained an objection to it on grounds of "[i]mproper opinion from a lay witness, relevance, and beyond the scope"; however, the testimony itself was not struck from the record.

The next day, Ocampo came by the scene of the accident involving Gonzalez, shortly after it happened. He saw two bales on the ground, the twine was cut on one bale but not the other one. He believed the bales fell from a stack of hay that was right next to Gonzalez.

At present, the dairy uses a different contraption on the loader in place of the bucket, to knock down haybales off the haystack.

### G. Trial Testimony of Ricardo Gonzalez

Ricardo Gonzalez, plaintiff, testified on his own behalf. Gonzalez had worked for five to six years at AC Enterprises when the accident occurred. He started as a milker and had recently joined the feed team when the accident occurred. In order to feed the cows, Gonzalez first had to knock down a haybale from the top of the haystack with a bucket loader. Brasil had told him to push only one bale at a time and he was aware that bales could fall from a haystack. After pushing down a bale, Gonzalez would then move the bale a safe distance away from the stack (i.e., 30-40 feet), cut the "threads or wires" that were used to bind the hay into a bale, tear the bale apart with the loader, and put the hay into a grinder. He would use four to five bales to feed the cows. Gonzalez had worked with both small bales and big bales.

Gonzalez had no memory of the April 2017 accident. The accident led to injuries to Gonzalez's head, face, pelvis, and legs, among other parts of his body. He was in the hospital for weeks, followed by successive stints in a rehabilitation hospital, the Centre for Neuro Skills, and the Pacific Spine Center. He had seen numerous doctors as well as a psychologist. During that time, he was in terrible pain, had double vision, was fed through a tube to his stomach, and had a lot of issues. He had to have all kinds of implants in his face. He had to be taught to walk again. He had vision problems in his left eye to this day and had lost his sense of smell as well as sexual function; he also had ongoing lower back pain.

After the accident, he developed a lot of anxiety and suffered from depression; even now, he could not handle noise and his anxiety was triggered in large groups of people. He has to isolate himself to cope. Gonzalez is on Celexa and Gabapentin. He has been under treatment for four years; he is able to drive, do household work, and volunteer at a senior center. Gonzalez testified: "I have thoughts of suicide. Sometimes I feel like doing nothing. I can't take interest in what I'm doing."

### H.  *Testimony of Hortencia Gonzalez*

Hortencia Gonzalez (Hortencia) is Gonzalez's wife; they were married in 1988 and had four children together. Hortencia works at a hotel. Hortencia testified that, prior to the accident, Gonzalez was a hardworking person, who was never sick and never missed work. He was a very good husband and father.

After the accident, Gonzalez was taken to Kaweah Delta Hospital; a few hours later he was taken by helicopter to a hospital in Fresno, where he stayed for two to three weeks. Hortencia stayed by his side. His pelvis was broken, his legs were broken, his mouth was surgically closed (he was fed by tube); he had daily surgeries to his head, forehead, nose, throat, and teeth. He was later transferred to San Joaquin Hospital, and from there to the Centre for Neuro Skills in Bakersfield for six months. Hortencia stayed with him throughout. He had to learn to walk again, like a child. Eventually, he came home.

Gonzalez continues to have a lot of pain and has lost his sense of smell. He has also developed anxiety, depression, and forgetfulness; he gets frustrated and is reclusive now. He has tried to commit suicide and it is not appropriate to leave him alone at home. He sees a therapist for emotional problems. Hortencia and Gonzalez are no longer intimate. Hortencia, though, loves him "even more" than before.

### I.  *Other Relevant Witness Testimony*

Two of Gonzalez's children testified on his behalf.

Jennifer Wakefield, a claims specialist for Zenith Insurance Company, testified on behalf of intervenor, Zenith, which (as noted above) was Carl Brasil's workers compensation insurer. Wakefield testified that Zenith had paid $881,649.56 in medical benefits on Gonzalez's workers compensation claim.

Dr. Christopher Stephenson, M.D., who is board certified in physical medicine and rehabilitation and subspecialty certified in brain injury medicine, testified on behalf of Gonzalez. Dr. Stephenson reviewed Gonzalez's extensive medical records, interviewed Gonzalez, and performed a physical examination; he diagnosed Gonzalez with a range of physical and other issues. He opined that Gonzalez is not employable and requires routine monitoring by a caregiver. Dr. Stephenson generated a "restorative life care plan" for Gonzalez; the life care plan included 24-hour assistance for Gonzalez for the rest of his life.

Kelly Nasser, R.N., testified that she researched and assigned reasonable cost figures to the life care plan generated by Dr. Stephenson.

Diomaris Safi, Psy.D., a neuropsychologist, testified on behalf of Gonzales. She diagnosed Gonzalez with major depressive disorder associated with traumatic brain injury and mild neurocognitive disorder.

Kurt Weiss, a forensic engineer and traffic collision reconstructionist, testified as a retained expert for Gonzalez. Weiss testified he was tasked with stacking hay in different configurations and determining the force needed to tip each type of stack; Weiss acknowledged that the ground surface where he conducted his project was sloping. Weiss stacked hay bales on their three-foot sides and on their four-foot sides during his experimentation. Weiss did not attempt to reconstruct the actual accident at issue in this case and was not retained to offer an opinion as to what happened on the day of the accident.

The trial court struck the entirety of Weiss's testimony (the trial court's ruling striking Weiss's testimony is not at issue in this appeal). Prior to making its ruling the

20.

court indicated its concerns: "Let me just state on the front side, um, this experiment – these experiments aren't even close to what the testimony has been in the case …. And I just have concerns 352 concerns. Um, incomplete experiments, um, experiments that don't reflect the, um, testimony in the case." Subsequently, in making its ruling, the trial court stated: "I'm going to strike [Weiss's] testimony. Um, I just can't compare it to the actual facts of this case. Um, 350, 352, incomplete and inaccurate experiment[s] are the formal bases for striking this testimony. Um, I think it's misleading."

## II.     Hettinga's Motion for Nonsuit

When Gonzalez and intervenor rested after presenting their cases in chief, Hettinga moved for nonsuit. Hettinga's counsel stated: "So at this time I would like to move for nonsuit, first on the completed and accepted doctrine, which was outlined in the brief that we had filed. But now that we have all of the evidence, I think it is undisputed that the hay was delivered and accepted by Carl Brasil, at which point it became his property and at which point he becomes responsible for it." Counsel added: "Whatever condition it's in is open and obvious to anyone. I don't think there is any other way that [the] hay is 3-by-4-by-8 feet in size. So whichever way it's configured, and there's a dispute, obviously, over that, it doesn't matter. They all could see it with their eyes, and if there was a problem with it, they knew it from the moment that they had it delivered."

Hettinga orally expanded its motion for nonsuit to other grounds beyond the completed and accepted doctrine. Hettinga's counsel continued: "But in addition to that, I don't think either of the plaintiffs have put on a case of negligence on the part of Hettinga. All they've said is some hay was delivered. There is absolutely no evidence that they did anything that was negligent. They have no standard of care person coming in to testify. Um, they have no one to say that what they did was wrong. In fact, everybody says the hay was stacked just fine. It wasn't falling over." Counsel next argued that Gonzalez and intervenor had also failed to prove causation, that is, that Hettinga caused the accident involving Gonzalez. Counsel contended: "That hay would

21.

not fall on its own but for Mr. Gonzalez creating a lean in the haystack and it falling after he disrupted it."

In addition, Hettinga's counsel argued that the court was required to grant nonsuit because Gonzalez and intervenor had not presented evidence to specifically establish that the actual medical care provided to Gonzalez "was reasonable, necessary and required because of the accident," and Gonzalez had not specifically established that it was more likely than not that any future medical care was reasonable, necessary, and required because of the accident.[4]

After Hettinga's counsel had presented her oral nonsuit motion, the court asked her: "Is it your opinion, Counsel, that the issue of standard of care causation [*sic*] in this case requires expert testimony by the other side?" Hettinga's counsel replied: "Not causation." The court then asked, "Standard of care?" Hettinga's counsel responded: "In this case, it's a good question, because it's so unusual what they're alleging. Um, I think they would have to in order to establish what – what the practice is in this case."

Intervenor's counsel and Gonzalez's counsel vigorously opposed Hettinga's motion on all grounds. Among other arguments, intervenor's counsel argued: "So as we indicated in our brief, the accepted work doctrine is not in their answer, was never pled as an affirmative defense. What they say in their briefing is, well, we hit it in some other affirmative defenses, and maybe you should have known it was in there. It was never pled. Okay? So we're addressing something that was never pled." Intervenor's counsel

---

[4] In the trial court, Hettinga's counsel also argued that Gonzalez had not introduced evidence relevant to his claim for damages based on wage loss and future loss of earnings. Specifically, Hettinga's counsel argued: "Lastly, the wage loss claim that is still pending. There's not been a single bit of testimony about how much money Mr. Gonzalez made. Ever. How much money he lost, how many days he was off work, who told him he should not work. There's been no evidence of future loss of economic damages. There's been no economist to present any numbers whatsoever. [¶] So a nonsuit on wage loss and future loss of earnings must be granted because it would invite the jury to speculate because we have no evidence at all of anything related to the wage loss." However, Hettinga has not raised or addressed this issue on appeal.

22.

also pointed out: "All of the cases that apply to the accepted work doctrine deal with construction projects and not chattels or goods like we're dealing with here."

Turning to the negligence claim against Hettinga, intervenor's counsel argued: "So if we start with the duty issue, the first step in this case is the contractual relationship between Mr. Brasil and his dairy and Hettinga Transportation. And that, of course, is the source of the duty. [¶] What we have here is a classic case of a negligent undertaking by Hettinga. They were paid money to deliver and stack hay in a reasonable [manner], and we don't think they did it. It's a common negligent undertaking. You see it all the time in contracts, and that's why you don't need an expert witness here to testify about what the standard of care is. There is a jury instruction on negligent undertaking." Intervenor's counsel added: "Okay. So there's a contract made. The hay is delivered. Um, counsel indicates there's a dispute as to how the hay was stacked. I would say absolutely there is no dispute at this point given the standard the Court must view the evidence in, in a nonsuit fashion." Intervenor's counsel continued: "Applying that prism to how we look at the evidence, the evidence is totally one-sided that the hay was stacked on the narrow 3-foot side, four bales tall."

Referring to Exhibit 451, which was a rough diagram of the scene of the accident sketched by Carl Brasil for OSHA, intervenor's counsel stated: "Um, and this is a really important exhibit in my mind, Your Honor, because while we don't have photographs – we established that yesterday – um, this is the best we got, in my view. And what it shows is there's two columns here, each column 8 feet wide, stacked on the 3-foot edge. Okay? [¶] According to Mr. Brasil – and the testimony has to be read favorably to us, of course, at this stage of the case … [Gonzalez] went over to the right side column on Exhibit 451 and took down three bales from that column … [¶] At this stage of the case, there is no evidence, especially under the nonsuit standard, that when Mr. Gonzalez took down the three bales from the right side that he did anything to disturb the left side. No one has testified to that. Carl Brasil said he thought he might have. Carl Brasil doesn't

23.

know. And so the inferences have to be drawn in our favor that Mr. Gonzalez did nothing to disturb the left-hand stack when he took the three down."

Intervenor's counsel added: "So when he took the three down, he drove the [loader] over, knocked them over, drove the loader back over, walked back over. All the while this stack [on the left] is still remaining stable. It's not moving. He's over here, takes out his knife, scissors, whatever. He starts cutting the twine off of the bales. As he's walking back, the other stack on the left on Exhibit 451 topples over and lands on top of him." Intervenor's counsel continued: "We know from the testimony – it's undisputed – that he was some distance away from the stack but not enough to avoid the 16-foot stack. If this was a [shorter stack, e.g. a standard nine-foot stack], we wouldn't be here today. It would have landed short of him even if it could topple, which I don't think it could." Counsel concluded: "The ordinary peril the cow feeders would face every day is an ordinary stack, according to Hettinga, ordinarily would do this with a 9-foot stack. That's an ordinary risk that the dairy workers face every day when they go over to the hay."

The court then asked intervenor's counsel: "What testimony was provided that stacking hay in [the manner Hettinga did] falls below the standard of care in the industry or below the industry standard as far as stacking hay?" Intervenor's counsel responded: "So, again, I don't think it's an industry standard. It's a simple negligence, carelessness thing." Intervenor's counsel explained: "The jury without expert testimony can conclude that it was unreasonable to put it on the 3-foot side, which makes things wobblier, and then make it 16 feet tall and then stacked in a way that if you foreseeably – which this was – foreseeably knock down an adjacent stack that the other adjacent stack would remain standing for some period of time, giving him a false sense of security, until you happen to walk by it 10 to 15 feet away and then it silently falls on you. You don't need an expert to see that. And I don't think you need an expert to know that there is no way

24.

this could happen if it was 9 feet tall. This only happened because it had a wobbly bottom and too much height. You don't need an expert for that."

Intervenor's counsel further explained: "So there's no evidence in the record that there is any standard that applies to stacking hay. It was a wild guess from [Hettinga's] counsel when you asked the question as to whether there should be expert testimony. I suspect she said yes because we don't have any, and we don't need any. And there's no evidence to we would need any." Intervenor's counsel added: "This is common sense how you stack hay in a safe way so it doesn't topple over. The one way to make sure that taking down some of the hay to feed the cows doesn't cause a problem later on is to stack it 9 feet high, which they have plenty of room to do, according to Carl Brasil. And if they had stacked it 9 feet high, we wouldn't be here. And that's the case." Intervenor's counsel concluded: "And the problem with stacking it 16 feet high, when … Mr. Gonzalez took down the three bales that he did and then untied them and that column remained steady strongly suggests, and I believe the jury can find, that the insidious part of the way that they stacked this was … it's almost like a house of cards, Your Honor. This one depended for its stability on this one. And on one knew that until those bales were taken down. [¶] That's the problem with this thing, and that's why it's a question of fact as to whether it was patent or latent. The peril was hidden in the way that [Greg Brinkley] stacked the hay too tall and too narrow."

Thereafter, the court observed that it had sua sponte brought up the issue of whether an expert witness on the applicable standard of care was required in this case. The court explained: "[B]ecause it's obvious that no expert has been designated or brought forward to testify as to standard of care." The court pointed out that Hettinga's counsel had noted, in response to the court's question on the issue, " 'that's a good question.' " The court added: "[N]egligence and the elements that are set forth in negligence include standard of care." The court turned to intervenor's counsel, stating: "I'm still a bit stuck on – first of all, I believe your position is that this is a [latent] defect,

25.

um, that Brasil would not know about. So the question I have is if this is a stack of hay, and this is what's being argued by [Hettinga] that's sitting there, is claimed by plaintiff 16 feet high, all stacked as alleged by plaintiff the wrong way, how is that latent?"

The question of a latent or patent defect came up because the parties indicated it was relevant to the work-completed-and-accepted doctrine, which was invoked by Hettinga as one of the grounds for its motion for nonsuit. Intervenor's counsel responded, in the context of that doctrine, that it was not a question of a latent defect but of a latent danger, assessed objectively. Counsel went on: "Objectively, I don't think it's reasonable to think that if the stacks were there for 14 hours with no problems, you take down one stack, still no problems for a matter of minutes, nothing's wrong. It's still standing there. That's why it was important for me to point out the sequence of events. That makes it possible for the jury to conclude on an objective basis. That's why it's a question of fact [whether] it was [a] latent and not patent [danger] [for purposes of the work-completed-and-accepted doctrine]."[5]

The court then asked intervenor's counsel: "Which leads me to the follow-up question: If it's latent in the [manner] that you describe and the average person wouldn't know that it's a defect, how could the average person without any kind of special skill or knowledge be able to evaluate standard of care or negligence in the case?" Intervenor's counsel pointed to Steve Hettinga's testimony to the effect that Hettinga had trained Greg Brinkley with regard to safe and unsafe practices in stacking hay. Intervenor's counsel highlighted Steve Hettinga's testimony that Hettinga had trained Brinkley not to stack hay bales on their three-foot edges because doing so would be dangerous as bales placed on their three-foot edges " 'could fall.' " Intervenor's counsel stated: "So we now have Hettinga testimony saying that they trained Brinkley, the squeeze operator, to not stack it

---

[5]  The question of a latent or patent defect/danger was not relevant to the discussion on negligence, but rather came up in the context of the work-completed-and-accepted doctrine (see below).

26.

on the 3-foot side because it was dangerous and they would fall." Intervenor's counsel added: "That's enough, in my view, to deal with the standard because now it's a simple negligence case of Brinkley didn't follow his training, and he's an employee of Hettinga. And the reason that they gave him that training, because if you put it on the 3-foot side it could fall. That's the testimony."

Hettinga's counsel countered: "[I]t does require expert opinion to establish the negligence of a party of a professional like a truck driver or delivery company in order to keep going with this case. [¶] And I'll cite a case to you. An Allied Properties versus Bloom. It dealt with a temporary … dock in the water. And there, just like in this case, you need expert opinion to establish the standard of care. That is required for how to deliver it and how to stack it." With respect to the work-completed-and-accepted doctrine and the issue of whether the danger or defect at issue was latent or patent, Hettinga's counsel argued: "On the latent defect issue, it is not a latent defect. Their whole theory is that it was stacked this big. It was 16 [feet] – it was wrong. It was stacked; that they could see it with their open eyes."

The court then made its ruling, verbally. The court stated:

> "I am going to grant the motion for nonsuit based on plaintiff's failure to, um, provide expert testimony on standard of care in this case. Um, based on the discussion, it is the plaintiff's argument that this is a, um, latent defect in the case and not simply, um, stacking the hay bales in a manner which is 3-foot down; that there is more. Once you have a stack of hay with no visible defects, it comes down to, um, define the standard of care as far as stacking of hay.
>
> "As far as, um, this particular case – and I will reference the Allied case just, um, cited by [Hettinga's] counsel – there is a series of cases that reflect the same information. Once we come down to calculations of a haystack that appears in all respects to be normal, um, it becomes a series of complex calculations as to whether or not the manner in which the haystack is stacked falls below the standard of care in this particular case.
>
> "I don't believe the jury will be able to make that. Those types of calculations would be exclusively within the knowledge of an expert.

27.

Weight, lean, condition of the hay, stacking, friction, force, angles, temperature, et cetera, all of those items, um, are outside the knowledge of the laymen.

"In, um, reaching this conclusion, as you can tell, we spent quite a bit of time discussing these items. Um, I want to readdress the testimony of Kurt Weiss, who, I believe, was plaintiff's attempt to provide those calculations, um, to the jury. I want to reiterate, um, that the tests performed by Mr. Weiss, and the reasons why I excluded that testimony, um, the tests performed were simply not relevant to this case before the Court and before this jury. It used, um, testing techniques. It used apparatus. It used hay. It used, um, slope. It used every variable, none of which were represented by the facts of this case. [¶] And, um – and I took striking Mr. Weiss's testimony more serious than you can imagine. Um, great thought.

"So I want to explain to you, again, I understand that may have been plaintiff's attempt to provide some evidence as to, um, how stacks would topple, but it was absolutely, in my opinion, 350, 352, um, included significant amount of facts not in evidence, lack of foundation, et cetera.

"So absent that testimony, plaintiff's case fails. Um, because of rendering this decision, it renders a decision based on defendant's motion regarding, um, medical expenses, um, moot as well as the nonsuit for – as filed for acceptance of the hay. [¶] So based on that decision – [¶] – judgment will be entered in favor of defendant in this case."

Plaintiffs Gonzalez and Hortencia Gonzalez, as well as intervenor, Zenith Insurance Company, have appealed the trial court's ruling that granted Hettinga's motion for nonsuit as to plaintiffs' and intervenor's negligence claims, on grounds that expert witness testimony on the standard of care for stacking hay was required but not presented in plaintiffs' and intervenor's cases in chief.

DISCUSSION

**I. Trial Court Erroneously Granted Hettinga's Motion for Nonsuit as to the Negligence Claim Against Hettinga, on Grounds that Expert Testimony Was Required, But Not Presented, on the Applicable Standard of Care**

**A. Standard of Review**

A motion for judgment of nonsuit is a motion made after the plaintiff's opening statement, or after the plaintiff has presented his or her evidence. (Code Civ. Proc., § 581c, subd. (a).) The motion concedes the truth of the facts asserted (if made after the opening statement) or shown (if made after the presentation of the plaintiff's evidence), but claims they fail as a matter of law to support the plaintiff's cause of action. (*Gray v. Kircher* (1987) 193 Cal.App.3d 1069, 1071.) "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by [the] plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

When the motion is made after the plaintiff has presented his or her evidence, the standards for granting it are the same as the standards applicable to a motion for a directed verdict or for reversing a judgment on appeal based on a lack of substantial evidence:

> "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] ... In other words, the

function of the trial court on a motion for a directed verdict [or nonsuit] is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge ... the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict [or nonsuit]." (*Estate of Lances* (1932) 216 Cal.397, 400-401; see *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839.)

The substantial evidence needed to defeat the motion is "evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) A mere scintilla of evidence or evidence that is bare speculation or conjecture is not enough; rather, there must be some substance to the evidence upon which a reasonable person could rely. (*Nally v. Grace Community Church, supra*, 47 Cal.3d at p. 291.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

We review a judgment of nonsuit de novo, applying the same standards as the trial court. (*Nally v. Grace Community Church, supra*, 47 Cal.3d at p. 291; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060.)

## B.     The Standard of Ordinary Care Applies Here

The elements of a negligence claim are " 'a legal duty of care, breach of that duty, and proximate cause resulting in injury.' " (*Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 831 (*Staats*); *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142 (*Kesner*) ["A plaintiff in any negligence suit must demonstrate ' "a legal duty to use due care, a breach of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury." ' "]; *Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627, 643, 645 ["[b]reach is the failure to meet the standard of care"; "[t]he element of

30.

causation requires there to be a connection between the defendant's breach and the plaintiff's injury"]; CACI Nos. 400, 401.)

" 'California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.' " (*Kesner*, *supra*, 1 Cal.5th at p. 1142.) Under Civil Code section 1714, " '[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.' " (*Staats*, *supra*, 25 Cal.App.5th at pp. 832-833, quoting Civ. Code, § 1714, subd. (a).) In short, " 'each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances." ' "[6] (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).)

" ' " '[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of *reasonable conduct* in … light of the *apparent risk*.' " ' " (*Staats*, *supra*, 25 Cal.App.5th at p. 833, italics added.) Further, "[b]ecause application of [due care] is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances." (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997 (*Flowers*); see *Tucker v. Lombardo* (1956) 47 Cal.2d 457, 464 [the amount of care to be exercised by a reasonably prudent person will

---

[6] " ' "Courts … invoke[] the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act.' " ' " (*Kesner*, *supra*, 1 Cal.5th at p. 1143.) "The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Ibid*.)

vary with the circumstances in that a reasonably prudent person would exercise a degree of care commensurate with, and in proportion to, the danger involved]; *Beck v. Sirota* (1941) 42 Cal.App.2d 551, 557 ["The amount of care must be in proportion to the danger to be avoided and the consequences reasonably to be anticipated."]; *Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627, 639 [" 'In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances.' [Citations.]  This is because '[e]ach case presents different conditions and situations.  What would be ordinary care in one case might be negligence in another.' "].)  In short, the duty is of ordinary care under all the circumstances, and the standard is that of the "ordinary prudent or reasonable person."  (6 Witkin Summary of Cal. Law (11th ed. 2023) Torts, §§ 998, 1000; *Tucker v. Lombardo*, *supra*, at pp. 463, 464.)

The question whether a defendant satisfied or breached the duty of due care under the circumstances is ordinarily a question of fact for the jury in each case.  (*Staats*, *supra*, 25 Cal.App.5th at p. 832 [while the existence of a duty of care is a question of law for the court, the elements of due care/breach, causation, and injury are fact-specific issues for the trier of fact]; see 6 Witkin Summary of Cal. Law (11th ed. 2023) Torts, §§ 996.) "Negligence may be established by circumstantial evidence, which is nothing more than one or more inferences which may be said to arise reasonably from a series of proven facts.  [¶]  A plaintiff relying on circumstantial evidence does not have to exclude the possibility of every other reasonable inference possibly deriving from the evidence. (*Sparks v. Allen Northridge Market* (1959) 176 Cal.App.2d 694, 699 (*Sparks*).)  Here, an appeal from a judgment of nonsuit, "[w]e must assume the truth of plaintiff's evidence and every inference of fact which reasonably may be drawn therefrom."  (*Ibid*.)

It is undisputed that Hettinga owed a duty of care to AC Enterprises, to safely stack the hay bales it delivered to the dairy.  In stacking the hay bales upon delivery, Hettinga was required to conform its conduct to the standard of reasonable prudence

under the circumstances. For purposes of establishing a negligence claim against Hettinga, plaintiffs and intervenor had the burden to show that Hettinga did not exercise due care or act with reasonable prudence in stacking the bales.

Here, the record contains evidence from which a jury could properly find that Hettinga did not exercise due care in stacking the hay upon delivery to AC Enterprises. Plaintiffs and intervenor presented evidence, in the form of the respective testimony of Carl Brasil, Frank Ricardo, and Lorenzo Ocampo, as to the manner in which Hettinga stacked the bales delivered to AC Enterprises on April 28, 2017. The bales were stacked in two adjacent rows of haybale stacks or columns, with each column or stack being four bales high (rather than the three-bale-high configuration Hettinga typically used). Moreover, the bales were stacked on their narrow ends, that is, the three foot by eight foot ends, rather than on their wider bases, that is, the four foot by eight foot bases (typically bales were stacked on their four foot by eight foot bases). Thus, not only was each column four bales high, but each bale therein was stacked in an "upright," rather than "flat," position (stacked upright, each bale was four feet high, whereas if stacked flat, each bale would have been three feet high). The total height of each column of bales was therefore 16 feet (typically, Hettinga stacked hay in columns that were nine feet high). The jury was shown models of the haybales in question, as well as photographs.

Robert Maestaz had worked as a truck driver for Hettinga for nine years and drove the delivery truck/trailer carrying the haybales delivered to AC Enterprises in April 2017. Maestaz testified that, typically, hay bales were stacked on his truck in nine-foot-high columns (that is, the bales were stacked three bales high, with each bale resting on its four foot by eight foot base). Thereafter, typically, the hay would be taken off the truck and stacked on the ground or in a barn in the same configuration as it was stacked on the truck. Thus, when Maestaz brought hay to a delivery site, Greg Brinkley would "regularly" stack the bales in columns that were three bales high (nine-feet high overall), with the bales resting on their four foot by eight foot sides.

33.

Greg Brinkley, who unloaded haybales off Hettinga's trucks at delivery sites, testified that when hay was stacked outdoors for immediate feeding, it would be stacked "three high." Brinkley, who knew Carl Brasil, further testified that, typically, Carl Brasil wanted his hay stacked "[t]hree high." Brinkley was also aware how Carl Brasil's dairy workers would dislodge bales from the stack to use for feeding the cows. Brinkley testified, they "[p]ushed it down [with] the loader." The loader's maximum reach or height was 12 feet.

Frank Ricardo, who managed the fields around Carl Brasil's dairy, testified he remembered how the hay was stacked on the morning of the April 2017 accident: "It was stacked upright." More specifically, the bales were stacked resting on their three-foot side and were stacked "[f]our high." Ricardo had worked in the dairy farming business for 45 years; he had stacked hay himself and had previously worked unloading hay trucks for a farmer. Ricardo had seen hay stacked in this type of "[u]pright" configuration only *once* before.

Carl Brasil saw the haystack on the morning of the accident, when he came upon the scene of the accident. He saw some bales on the ground as well as the rest of the haystack. He testified: "Those were the rest of the load. Um, and they were in two columns, and they were stacked on the 3-foot end and four high, so that would be 16 feet in the air." In a report Brasil thereafter submitted to OSHA, he wrote: "The 'root cause of this incident was poor hay stacking by the trucking company. The bales should have never been stacked in the position in the *extreme* height." (Italics added.)

Brasil was asked at trial, in light of all the hours he spent working with the hay immediately following the accident, whether he had any doubt in his mind that it was stacked on its three-foot side and not its four-foot side? Brasil responded: "There's no doubt it was stacked on its 3-foot side." Brasil was further asked: "Based on what you observed when you found Mr. Gonzalez lying on the ground, was there any limitation

34.

that you saw in the area where the hay was stacked that would have prevented the hay from being stacked as low as two high instead of four?" Brasil answered: "No."

Steve Hettinga, vice president of Hettinga, testified that Hettinga had trained Greg Brinkley as to safe and unsafe stacking practices. Hettinga trained Brinkley not to stack haybales on their three-foot edges because doing so would be dangerous, in that the bales "could fall." Steve Hettinga testified that "at least a couple of times a week" he would check on Brinkley's work to make sure that, among other things, bales were not stacked on their narrow, three-foot edges.

Steve Hettinga noted his trucks could legally hold bales to a maximum height of "10 feet." When asked what height of stacked bales was considered safe by Hettinga Transportation, Steve Hettinga replied, "whatever was on the truck." He clarified that the typical configuration of bales on a truck—i.e., bales stacked three high, on their wide, four-foot edges, to a height of nine feet—when recreated on the ground, was considered a safe configuration/height by Hettinga Transportation.

The record contains ample evidence regarding the manner in which the big bales of hay at issue here were typically stacked for transportation as well as the customary and preferred way—for purposes of safety—to stack such haybales upon delivery. Frank Ricardo, Carl Brasil, and Steve Hettinga, all of whom were knowledgeable about stacking hay, indicated that big bales should never be stacked on their narrow, three-foot edges, for reasons of safety and stability, especially when higher stacks were at issue.

It is well settled that violation of an employer's policies and company rules—this issue was implicated in Steve Hettinga's testimony—is competent evidence of negligence. (See *Davis v. Johnson* (1954) 128 Cal.App.2d 466, 472-473 ["It is well settled that [company] rules are admissible in evidence and their violation is a circumstance to be considered in determining negligence."]; *Dillenbeck v. Los Angeles* (1968) 69 Cal.2d 472 [police car responding to an emergency, caused fatal accident; police department safety protocols for driving in response to an emergency were

admissible on issue of negligence of officer driving the police car]; *Simon v. San Francisco* (1947) 79 Cal.App.2d 590, 597 [company rules relating to safe operation of streetcar were relevant to question whether motorman's conduct constituted negligence; whether such rules were violated by the conduct of motorman was, under the circumstances, a question of fact].)

Furthermore, the above witnesses were well familiar with safe stacking practices at dairies in the area and were competent to testify to prevailing practices and customs in this regard. Frank Ricardo testified that in his 45 years in the dairy industry, he had only once before seen big bales stacked "upright," that is, on their narrow, three-foot edges. Carl Brasil testified that, with the exception of the delivery at issue in this case, the bales delivered to his dairy were "always" stacked on the four-foot side. Greg Brinkley testified that, upon delivery to AC Enterprises, hay was typically stacked "[t]hree high" for immediate use, as that was how Brasil wanted it stacked. Brasil noted in his report to OSHA that the 16-foot height of the haystack Hettinga left on his property was " 'extreme.' " And Steve Hettinga testified he had never seen Greg Brinkley stack big bales on their narrow, three-foot edges, and that doing so was unsafe. This evidence shed light on hay stacking customs and practices in the local area, which practices "have a direct bearing on the question of negligence even though they do not of themselves establish the standard of prudent conduct." (*Tucker v. Lombardo*, *supra*, 47 Cal.2d at p. 464; *Owen v. Rheem Mfg. Co.* (1947) 83 Cal.App.2d 42, 45 ["Custom may assist in the determination of what constitutes due care. What others do is some evidence of what should be done, but custom is never a substitute for due care."]; CACI No. 413.)

Big bales are massive and super heavy, weighing approximately 1,100 pounds or half a ton per bale. When stacked four-high, the bales comprise 4,000 pounds or two tons of hay. It is therefore clear that working with such bales can be extremely dangerous (including for dairy workers) and that great care is reasonably required in stacking such bales (which are a dangerous item). (See CACI No. 414 ["People must be extremely

36.

careful when they deal with dangerous items or participate in dangerous activities. [*Insert type of dangerous item or activity*] is dangerous in and of itself. The risk of harm is so great that the failure to use extreme caution is negligence."]; *Borenkraut v. Whitten* (1961) 56 Cal.2d 538, 544-546 [a person of ordinary prudence is required to exercise extreme caution with regard to a dangerous item/activity].) Thus, the question is whether in stacking such bales, a reasonably prudent person would have stacked the bales on their narrower three-foot edges when they could have alternatively stacked them on their flat or wide, four-foot edges, especially as stacking the bales on their four-foot edges would result in a lower, overall stack height of 12 feet while stacking the bales on their three-foot edges would result in an "extreme" overall stack height of 16 feet. The bales also could have been stacked in the typical configuration and Brasil's preferred configuration, that is, three-bale-high/flat, which would have resulted in a very manageable (by all accounts) overall height of nine feet.

Here, the relevant safety considerations are fairly obvious and largely a matter of common sense. Stacking bales on their wider surfaces to a lower height would not only maximize stability but stacking the bales flat *and* to a lower height would enable workers more easily to reach and remove the top bale from a relatively stable base. The record contains ample evidence for a jury to find that stacking the bales, four high, on their narrow, three-foot edges, to an overall stack height of 16 feet, was a breach of the duty to use due care *under all the circumstances*. (See *Crane v. Smith* (1943) 23 Cal.2d 288, 299 ["If the actor reasonably can accomplish the same result by other conduct which involves less opportunity for harm to others, the risk incurred by the manner of doing business which resulted in injury is clearly unreasonable."]; 6 Witkin Summary of Cal. Law (11th ed. 2023) Torts, §§ 998 ["The basic question is whether the risk of danger to others outweighs the utility of the act or the manner in which it is done; if so , the risk is unreasonable and the act is negligent."]; *Dillon v. Legg* (1968) 68 Cal.2d 728, 739

[conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person].)

Sparks, supra, 176 Cal.App.2d 694, is instructive. In Sparks, the plaintiff, who was shopping in a small grocery store, bumped her grocery cart into a display, placed in a grocery aisle, of a five-high stack of *open* root beer cartons (each carton was 10 inches high and contained eight glass bottles of root beer under heavy pressure). The collision resulted in a bottle of root beer falling, shattering, and injuring the plaintiff's foot (a piece of glass went through the plaintiff's foot). The trial court applied the standard of ordinary care and found the jury could properly have determined the store owner was negligent in stacking the root beer cartons in the manner that led to injury.[7] (*Id*. at p. 700.) Similarly, in *Dahms v. General Elevator Co*. (1932) 214 Cal. 733, 742, a case alleging negligent elevator repair, the court noted: "we think that defendant was under a duty to plaintiff [who was injured when the elevator fell] to use ordinary and reasonable care in the repair and inspection of the elevator, and where as here the jury finds that defendant negligently performed its duties, and such negligence proximately contributed to the injury, the liability of defendant to plaintiff is clear." Finally, in *Owen v. Rheem Mfg. Co*., *supra*, 83 Cal.App.2d at p. 48, barrels that were stacked in a boxcar fell and injured plaintiff when he opened the boxcar door to unload barrels. The court resolved the question of

---

**7** While the facts of *Sparks, supra,* 176 Cal.App.2d 694 are relatively straightforward and uncomplicated, they are broadly analogous to facts of the instant case. *Sparks* thus helps to clarify the application of the principles of negligence to the instant case. *Sparks* determined that a jury could properly find that the grocery store owners there were negligent because a five-high stack of unsecured, open cartons with glass bottles, placed in a narrow aisle navigated by customers wheeling unwieldy carts, posed an unreasonable risk of harm to customers, in that a reasonably prudent person would not stack the root beer cartons in that manner under like circumstances. Similarly, here a jury could properly find that Hettinga was negligent because stacking haybales on their narrow edges (rather than on their flat bases) to the atypical and relatively extreme height of 16 feet posed an unreasonable risk of harm to dairy workers who routinely dislodged bales from the stack with a bucket loader to feed the cows, in that a reasonably prudent person would not stack the haybales in that manner under like circumstances.

negligence in the loading of the barrels under the standard of ordinary negligence. These cases are basically analogous to the instant case and clarify that the standard of ordinary care is adequate for resolving the question of negligence at issue here.

We conclude the trial court erred in granting nonsuit as to plaintiffs' and intervenor's negligence claims against Hettinga on grounds that expert testimony on the standard of care was required to prove the element of breach of the duty of care.[8]

## C.    Hettinga's Arguments are Unavailing

Hettinga's principal argument is that this case is one of professional negligence, rather than ordinary negligence. More specifically, Hettinga argues this matter implicates a professional standard of care and that expert testimony was required to establish the applicable professional standard of care. We disagree.

The standard of care that applies in professional negligence cases is the standard of care followed by others in the same profession as opposed to that of a "reasonable person." As a general matter, "[t]hose undertaking to render expert services in the practice of a profession or trade are required to have and apply the skill, knowledge and competence ordinarily possessed by their fellow practitioners under similar circumstances, and failure to do so subjects them to liability for negligence." (*Estate of Beach* (1975) 15 Cal.3d 623, 635; *Evans v. Hood Corp*. (2016) 5 Cal.App.5th 1022, 1050.) The Restatement Second of Torts, section 299A, states, "Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." This provision applies "to any person who undertakes to render services

---

[8] We note that the discussion between the trial court and the parties regarding whether the haystack had a latent or patent defect for purposes of the work-completed-and-accepted doctrine is irrelevant to the question of whether Hettinga stacked the haybales consistent with due care.

to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber." (Rest.2d Torts, § 299, com. b, p. 73.)  The Restatement Third of Torts states, "If an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person." (Rest.3d Torts, § 12.)

*Evans v. Hood Corp.* explains:  "For example, nonspecialist medical practitioners must use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical practitioners of the same type would use in similar circumstances (see, e.g., CACI No. 501), while medical specialists must use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical specialists of the same type would use in similar circumstances (see, e.g., CACI No. 502).  Similarly, an attorney must use ' "such skill, prudence, and diligence as members of his or her profession commonly possess and exercise." ' [Citation.] 'If [the attorney] further specializes within the profession, he must meet the standards of knowledge and skill of such specialists.' " (*Evans v. Hood Corp.*, *supra*, 5 Cal.App.5th at p. 1051.)

*Evans v. Hood Corp.* further explains:  " '[A] psychotherapist or other mental health care provider has a duty to use a reasonable degree of skill, knowledge and care in treating a patient, commensurate with that possessed and exercised by others practicing within that specialty in the professional community.' [Citation.]  ...  A blood bank must 'exercise with respect to blood testing and donor screening "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised" by other blood banks "under similar circumstances." [Citation.]' …  One who holds himself out as an expert soil tester must 'exercise the ordinary skill and competence of those in the business of soil testing,' because experts who possess special skills 'have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge

40.

that duty will subject them to liability for negligence.' " (*Evans v. Hood Corp.*, *supra*, 5 Cal.App.5th at p. 1051.)

"With respect to professionals, their specialized education and training do not serve to impose an increased duty of care but rather are considered additional 'circumstances' relevant to an overall assessment of what constitutes 'ordinary prudence' in a particular situation." (*Flowers*, *supra*, 8 Cal.4th at pp. 997-998.) "Since the standard of care remains constant in terms of 'ordinary prudence,' it is clear that denominating a cause of action as one for 'professional negligence' does not transmute its underlying character. For substantive purposes, it merely serves to establish the basis by which 'ordinary prudence' will be calculated and the defendant's conduct evaluated." *(Flowers*, *supra*, 8 Cal.4th at p. 998.)

In *Evans v. Hood Corp.*, the plaintiff—a pipeline repairman long employed by a gas company—asserted negligence claims against independent contractors hired by the gas company, alleging his asbestosis resulted from their activities. (*Evans v. Hood Corp.*, *supra*, 5 Cal.App.5th at pp. 1025-1026.) The evidence at trial showed that the gas company hired the contractors to engage in large-scale pipeline installation and repair projects. (*Id*. at p. 1027.) The plaintiff worked alongside the contractors, inspecting their work for compliance with the gas company's requirements. (*Id*. at p. 1028.) The gas delivery pipes that were the focus of the projects had an asbestos coating at the time. (*Id*. at pp. 1026, 1027.) Both sides called witnesses with expertise in gas pipelines, including experts regarding " 'the standard of care and … the state of the art.' " (*Id*. at p. 1052.) Later, the trial court instructed the jury that the applicable standard of care was that of a " 'reasonably careful construction contractor,' " as established by the testimony of the expert witnesses. (*Id*. at p. 1037.) On appeal, the plaintiff contended the instruction improperly imposed a professional standard of care. (*Id*. at pp. 1049-1050.) The *Evans v. Hood Corp.* court concluded the trial court did not err in giving the instruction in view

of "the extensive evidence… *about the very specialized profession of building and repairing gas pipelines*." (*Id*. at p. 1052, italics added.)

*Allied Properties v. John A. Blume & Associates* (1972) 25 Cal.App.3d 848 (*Allied*), on which Hettinga relies, is generally analogous to *Evans v. Hood Corp*. (See *Allied*, at p. 858 [expert testimony necessary to establish whether engineering firm adequately designed pier].) In both cases, the issue of negligence hinged on whether an independent contractor exercised due care in resolving technical questions regarding a construction project. *Allied* noted that "the standard of care applicable to a given profession must be determined from the testimony of experts *unless* the conduct involved is within the common knowledge of laymen." (*Ibid*.) Since *Allied* involved a marine engineering project, i.e., the construction of a commercial pier and floats, the issue of negligence with regard to malfunctions in the pier and floats implicated complex calculations pertaining to wave action, variable wave heights, and changing water levels. (*Id*. at pp. 851-854, 858.) The *Allied* court therefore determined the trial court there correctly instructed the jury that it could determine the marine engineering firm's standard of professional care, with respect to the construction project, only from the opinion of competent experts who testified as to such standards. (*Id*. at pp. 857-858 [noting that "[t]he voluminous record indicates that the standard of care and the complex calculations required were exclusively within the knowledge of experts, and that marine engineering is not an exact science].) However, *Allied*, *Evans v. Hood Corp*., and similar construction cases involving technical issues are distinguishable from the instant case.

Here, the record taken as a whole, does not indicate that stacking haybales was a highly specialized profession—requiring extensive education and training and involving tasks of great complexity—such that the issue of negligence pertaining to hay stacking would entail a professional standard of care and require expert testimony thereon. On the contrary, the record indicates that stacking hay was a relatively commonplace task in the relevant community. Frank Ricardo, who managed the fields surrounding Carl Brasil's

dairy, testified he had worked in unloading and stacking hay bales at one time. Similarly, Carl Brasil, who cannot be said to be in the profession of stacking hay, testified he would stack his own hay when necessary. Furthermore, Carl Brasil maintained a hay squeeze or similar machine for the use of his dairy workers. And Greg Brinkley testified it would take him no more than 15 minutes to unload and stack 45 bales of hay. There was no evidence to the effect that hay stacking was a highly specialized undertaking that was limited to a cadre of highly trained and/or licensed professionals with sophisticated technical skills. In sum, the present record does not support a conclusion that stacking hay is a specialized profession such that the issue of negligence in stacking hay appropriately entails a professional standard of care.

Moreover, even assuming that haybale stacking qualifies as a distinctive and highly specialized profession, the negligence claim at issue here did not turn on complex variables that would require expert testimony on the standard of care. As noted above, the question at issue here is whether Hettinga acted reasonably in stacking the bales on their narrower three-foot edges when they could, alternatively, have been stacked on their flat or wide, four-foot edges, especially as stacking the bales on their four-foot edges would have resulted in a more-manageable overall stack height of 12 feet, while stacking the bales on their three-foot edges resulted in an "extreme" overall stack height of 16 feet. The haybales could also have been stacked in the standard three-bale high/flat configuration, which was how hay was typically stacked at AC Enterprises and was how Brasil wanted hay intended for immediate use to be stacked. Evaluating whether Hettinga's actions were reasonably prudent turns on assessing whether Hettinga could have taken but did not take, fairly obvious and commonsense precautions, such as stacking the bales on their wide, flat four-foot edges, thereby ensuring a broader base as well as a lower overall stack height (given that an overall stack height of nine feet was typical for area, was considered safe by Hettinga, and was preferred by Brasil). (See *Crane v. Smith* (1943) 23 Cal.2d 288, 299 ["If the actor reasonably can accomplish the

43.

same result by other conduct which involves less opportunity for harm to others, the risk incurred in the manner of doing business which resulted in injury is clearly unreasonable."].)

In light of the nature of the issues implicated in this case, even if this case were to be viewed as a case of professional negligence, expert testimony on the standard of care was not required. (See *Allied*, *supra*, 25 Cal.App.3d at p. 858 [in professional negligence cases, where the conduct involved is within the common knowledge of laymen, expert testimony is not required]; *Bardessono v. Michels* (1970) 3 Cal.3d 780, 789 & fn. 6 [a "wide variety" of cases have applied the common knowledge exception to the expert testimony rule]; *Sanchez v. Brooke* (2012) 204 Cal.App.4th 126, 138-139 [no expert testimony was needed to show a health worker was negligent in permitting an elderly woman under her care to smoke in bed, in view of the fire hazard that conduct presented]; *Leonard v. Watsonville Community Hospital* (1956) 47 Cal.2d 509, 519-520 [no expert testimony necessary to establish that hospital and its medical staff did not exercise reasonable care by failing to count clamps removed after surgery, as that safety measure was within ken of average layperson]; see also *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 895-896 [explaining that expert opinions may be admitted as helpful even if *not necessary* for plaintiff to meet burden of proof].)

We conclude the trial court erred in granting nonsuit on plaintiffs' and intervenor's negligence claims against Hettinga on grounds that plaintiffs and intervenor failed to present expert testimony on the applicable standard of care.

## II. Nonsuit is Not Warranted on the Other Grounds Asserted by Hettinga

The trial court granted nonsuit only on grounds that expert testimony was required to establish a special standard of care, which ruling was erroneous. The other theories

asserted by Hettinga in the trial court and reasserted on appeal also do not support a judgment for Hettinga as a matter of law.[9]

## A. Causation

Hettinga argues that nonsuit should be granted because there is a question "whether the haystack collapsed because of some unreasonably dangerous condition allegedly created by Hettinga or because of another reason, such as the manner in which Mr. Gonzalez interacted with the haystack." (Fn. omitted.)  Hettinga adds:  "[T]he fact that the haystack remained standing until disturbed by Mr. Gonzalez suggests that the haystack never would have fallen on its own but, rather, only fell because Mr. Gonzalez … disrupted the stack."  Hettinga further contends:  "This is not a matter of 'common sense' … but, instead, a complex analysis requiring expert testimony."  Hettinga sums up:  "Not only was expert testimony required on the standard of care, it was also required to prove causation."  We are not persuaded.

" ' "Causation" is an essential element of a tort action.  Defendants are not liable unless their conduct … was a "legal cause" of plaintiff's injury.' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 696 (*Whiteley*).)

The "substantial factor" test for causation is appropriate in all tort actions.  (See Haning, et al., *Cal. Practice Guide: Personal Injury* (The Rutter Group 2022) ¶ 2:2398

---

[9]  As noted in *Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328, fn. 8, there is a split of authority over whether review of a grant of nonsuit is limited to grounds raised by the defendant and ruled on by trial court or whether review may extend to grounds raised by the defendant below even if not reached by the trial court.  The split arises from *Lawless v. Calaway* (1944) 24 Cal.2d 81 (*Lawless*), which noted that "grounds not specified in a motion for nonsuit will be considered by an appellate court only if it is clear that the defect is one which could not have been remedied had it been called to the attention of plaintiff by the motion." (*Id.* at p. 94.)  *Lawless*'s rationale "does not bar the consideration on appeal of alternative grounds which were stated by the moving party but which were not among those relied upon by the trial court in granting the motion." (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1542, fn. 2.)  Accordingly, we will consider the alternative grounds encompassed by Hettinga's nonsuit motion in the trial court.

(*Cal. Practice Guide: Personal Injury*); see *Whiteley*, *supra*, 117 Cal.App.4th at p. 696 ["A tort is a legal cause of injury only when it is a substantial factor in producing the injury."].) " ' "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." ' " (*Whiteley*, *supra*, at p. 699.) Thus, a force which plays only an " ' " 'infinitesimal' " ' " or " ' " 'theoretical' " ' " part in bringing about the injury is not a substantial factor, but a " ' "very minor force that does cause harm is a substantial factor. " ' " (*Ibid*.)

Further, "[c]ausation is a question of *reasonable probability*; 'legal cause' need not be proved with certainty, but mere possibility is insufficient to establish a prima facie case. Thus, the issue is whether it is *more likely than not* that plaintiff's injury was a result of defendant's act or omission." (*Cal. Practice Guide: Personal Injury*, *supra*, ¶ 2:2405.) "Expert testimony is … required on the issue of causation if the matter is so beyond lay experience that it can be explained *only* through experts." (*Cal. Practice Guide: Personal Injury*, *supra*, ¶ 2.370; see *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 290 ["As a general matter, juries may decide issues of causation without hearing expert testimony. [Citation.] But '[w]here the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation.' "].)

Here, plaintiffs and intervenor presented evidence that Hettinga stacked the hay on the narrow three-foot side, to an overall height of 16 feet. Steve Hettinga testified that Hettinga trained Brinkley not to stack haybales on their three-foot edges because doing so would be dangerous, in that the bales "could fall." Steve Hettinga noted his trucks could legally hold bales to a maximum height of "10 feet." When asked what height of stacked bales was considered safe by Hettinga Transportation, Steve Hettinga replied, "whatever was on the truck." He clarified that the typical configuration of bales on a truck—i.e., bales stacked three high, on their wide, four-foot edges, to a height of nine feet—when recreated on the ground, was considered a safe configuration/height by Hettinga

Transportation.  The jury also heard testimony from Carl Brasil to the following effect: " 'The root cause of this incident was poor hay stacking by the trucking company.  The bales should have never been stacked in the position in the extreme height.' "

Plaintiffs and intervenor thus presented strong evidence from which the jury could reasonably infer that the manner in which Hettinga stacked the hay was relatively unstable and undesirable, from a safety standpoint, for the purpose for which the hay was intended (the hay was meant to be taken down with a loader so it could be fed to the dairy's cows).  To the extent the jury found Hettinga was negligent in stacking the haybales on their three-foot edges to an overall height of 16 feet, the jury could reasonably infer there was a causal link between the negligent stacking of the hay and the collapse of the stack that injured Gonzalez.  (*Owen v. Rheem Mfg. Co*., *supra*, 83 Cal.App.2d at p. 47 [" 'If a reasonably prudent person might, and ordinarily would, foresee that the omission to do a certain act or the commission of an act in a certain way would likely result in injury to another, and injury to another does follow as a result thereof, such act of omission or commission is negligence, and the *proximate cause* of the injury' " (italics added)]; see *Sparks*, *supra*, 176 Cal.App.2d at p. 700 ["Before it can be held as a matter of law that *want* of proximate cause exists, the evidence must point unerringly to that conclusion" (italics added)].)

*Sparks*, *supra*, 176 Cal.App.2d 694, is instructive in the context of causation as well.  As noted above, in *Sparks*, the plaintiff bumped her grocery cart into a five-high stack of root beer cartons while shopping at a grocery store, resulting in a bottle of root beer falling, shattering, and injuring the plaintiff's foot.  The *Sparks* plaintiff brought a negligence suit against the grocery store alleging the store negligently stacked the root beer cartons.  *Sparks* rejected the grocery store's claim that the plaintiff could not establish causation.  The court noted that, on the contrary, "[i]t seems too clear for discussion that the jury could have reasonably concluded that defendants' negligence was the proximate cause of plaintiff's injuries."  (*Id*. at p. 700.)

47.

Also instructive is *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234 (*Osborn*). *Osborn* explains: "[C]ausation in fact is ultimately a matter of probability and common sense: '[A plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant that that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case.' " (*Osborn*, *supra*, at p. 253.)

Here, plaintiffs and intervenors were not required, as a matter of law, to exclude all other *possible* causes for the accident that led to Gonzalez's injuries. *Sarti v. Salt Creek* (2008) 167 Cal.App.4th 1187 (*Sarti*) clarifies his principle. In *Sarti*, a woman (Sarti) who suffered a foodborne illness (she was tested positive for campylobacter bacteria) sued a restaurant (Salt Creek Grille) where she had previously eaten a raw tuna appetizer and raw vegetables. Sarti's bacterial illness escalated into a variant of Guillain-Barré syndrome (a disease that damages peripheral nerves). (*Id*. at p. 1191.) The case went to trial and a jury found in Sarti's favor, but the trial court granted the restaurant's motion for judgment notwithstanding the verdict on grounds there had not been an adequate showing as to causation. (*Id*. at p. 1192.) The *Sarti* court reversed.

The *Sarti* court highlighted the connection between Sarti's bacterial illness and unsanitary conditions at the defendant restaurant. "Campylobacter is *not* found in raw tuna, unless that tuna has been cross-contaminated by raw chicken, where the bacteria is common." (*Sarti*, *supra*, 167 Cal.App.4th at p. 1191.) An investigation by the county health department identified four practices that could have led to cross-contamination of

the raw tuna with raw chicken:  wipe-down rags were not regularly sanitized; there was insufficient sanitizer in the dishwasher; chicken tongs were sometimes used to handle other food; and raw vegetables were not stored separately from raw meat.  (*Ibid*.)

*Sarti* concluded the circumstantial evidence presented by the plaintiff to connect her illness to eating raw tuna and raw vegetables at the restaurant, was sufficient to permit the jury to reasonably infer the food she ate at the restaurant was contaminated with campylobacter and was the cause of her bacterial illness.  (*Sarti*, *supra*, 167 Cal.App.4th at p. 1207.)  *Sarti* rejected the restaurant's assertion "Sarti was required, as a matter of law, to exclude all 'possibilities' other than the meal she had at the restaurant." (*Id*. at p. 1210.)

Rather, *Sarti* clarified that "California law on causation is 'substantial factor' " and "a plaintiff need not ' "exclude every other conclusion" ' than the defendant's negligence."  (*Sarti*, *supra*, 167 Cal.App.4th at p. 1210, citing *Dougherty v. Lee* (1946) 74 Cal.App.2d 132, 136 [" 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion.' "].)  Further, to the extent there was a possibility of alternative causes for Sarti's illness, *Sarti* emphasized that the word " 'possibility' " "must necessarily connote something more than bare conceivability or plausibility, otherwise it would swallow up the universe." (*Sarti*, *supra*, 167 Cal.App.4th at p. 1210 [it is "ludicrous" to suggest that attenuated, alternative explanations for Sarti's illness, "must, *as a matter of law*, defeat [her] food poisoning claim"].)  The *Sarti* court concluded Sarti had presented sufficient evidence to support a jury finding that she contracted her bacterial illness from her raw meal at the Salt Creek Grille.

Here, too, there was ample circumstantial evidence for the jury to find that Hettinga's negligence was a substantial factor in the haybales toppling over and injuring Gonzalez.  Moreover, as discussed above, the factual issues implicated here are not so

49.

complex or abstruse as to require expert testimony on the issue of causation.[10]  Nonsuit is not warranted for a lack of evidence of causation.

## B.     Work Completed and Accepted Doctrine

Hettinga argues that nonsuit should be granted based on application of the work-completed-and-accepted doctrine.  We disagree.

First, Hettinga cites only one case in support of its arguments that the work-completed-and-accepted doctrine applies here:  *Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461 (*Sanchez*).  *Sanchez* deals with the issue of "a contractor's negligent-construction liability after the owner has accepted the structure [that was contracted for]."  (*Id*. at p. 1470.)  CACI No. 4552, which addresses the affirmative defense of "work-completed-and-accepted," states that under this defense, "a party under contract for a construction project is not liable in negligence for injury caused by a patent construction defect once the project has been completed and the owner has accepted the project."  (See CACI No. 4552, "Directions for Use.")  The instant case does not involve negligent-construction liability, and Hettinga cites no authority establishing that the work-completed-and-accepted doctrine is applicable to the instant case.

Second, even if the work-completed-and-accepted doctrine were applicable in the present context, Hettinga has not shown the manner in which the hay was stacked was accepted, within the meaning of the doctrine, by AC Enterprises.  Hettinga contends that Lorenzo Ocampo's signature on the delivery receipt, as provided on the evening when the hay was delivered, establishes that AC Enterprises had accepted the manner in which the

---

**10** On the issue of the *need for expert testimony* to establish causation, *Sarti* is distinguishable from the instant case.  In *Sarti*, an expert testified that campylobacter was commonly found in raw chicken (the chicken at the restaurant in question was not tested for campylobacter) and addressed how cross-contamination could occur in the applicable circumstances.  These points, which related to potential campylobacter contamination and the transmissibility of campylobacter infection, were clearly beyond common experience.  (*Sarti*, *supra*, 167 Cal.App.4th at p. 1207.)  The instant case does not entail issues that are comparable in complexity to the causation issues implicated in *Sarti*.

hay was stacked; however, this contention does not withstand scrutiny. The document that was signed by Lorenzo Ocampo expressly indicates that signature thereon merely signifies that the hay was "received in good condition." In addition, Steve Hettinga testified that the document amounted to "proof of delivery" and signified that the goods were "received in good condition." Steve Hettinga was specifically asked what Ocampo's signature signified and he responded: "Mr. Ocampo's signature indicates [the hay] was received in good condition." Ocampo, for his part, testified he had not even seen the hay in question when he signed the delivery receipt, and further clarified that he did not work with hay. Ocampo's signature at best indicates the condition or fitness of the hay was acceptable; it does not signify that AC Enterprises had "accepted" the manner in which the hay was stacked for purposes of the work-completed-and-accepted doctrine.

Nor has Hettinga shown that Carl Brasil, the owner of AC Enterprises, had accepted, at the time the accident involving Gonzalez took place, the manner in which the hay was stacked upon delivery. Hettinga delivered the hay to AC Enterprises on the evening of April 28, 2017, after Carl Brasil had gone home for the day. The accident that injured Gonzalez occurred at dawn the next day, a Saturday, before Carl Brasil even had a chance to set eyes on the haystack. Accordingly, it cannot be said that, at the time of the accident, Carl Brasil had "accepted" the hay stacking performed by Hettinga. (See *Square Deal Mach. Co. v. Garrett Corp*. (1954) 128 Cal.App.2d 286, 290 [duty of inspection for the purpose of determining whether the property complies with the contract must be exercised within a reasonable time, and what is a reasonable time depends upon the circumstances of each particular case]; see also Cal. U. Com. Code, § 2513(1), and Coms. to U. Com. Code, Com. 2.)

Third, the work-completed-and-accepted doctrine is an affirmative defense. (See CACI No. 4552.) "An affirmative defense is *new matter* that defendants are required to plead and prove." (*Marich v. MGM/UA Telecommunications, Inc*. (2003) 113

51.

Cal.App.4th 415, 424, italics added; see Code Civ. Proc., § 431.30, subd. (b)(1) & (b)(2).) Hettinga did not plead the affirmative defense of work-completed-and-accepted in its answer. Therefore, Hettinga cannot rely on this defense. (See *Wang v. Nibbelink* (2016) 4 Cal.App.5th 1, 10, overruled on other grounds by *Hoffman v. Young* (2022) 13 Cal.5th 1257, 1270, fn. 13.)

Hettinga argues it was not required to raise the work-completed-and-accepted doctrine as an affirmative defense in its answer because the plaintiffs' complaint alleges that the hay was accepted. (See *Bevill v. Zoura* (1994) 27 Cal.App.4th 694, 698 ["Generally, a party must raise an issue as an affirmative defense where the matter is not responsive to essential allegations of the complaint. [Citations.] Thus, where a defendant relies on facts not put in issue by the plaintiff, the defendant must plead such facts as an affirmative defense. [Citation.] 'Where, however, the answer sets forth facts showing some essential allegation of the complaint is not true, such facts are not "new matter," but only a traverse.' "].) Hettinga's argument is unavailing, however, because plaintiffs' complaint does not allege that the hay was accepted by AC Enterprises as relevant here (it bears mention that Hettinga merely cites to the complaint as whole, rather than to any specific allegation(s) in the complaint).

### C. Medical Expenses

Finally, Hettinga argues that plaintiffs and intervenor were required to, but did not, "establish that the medical services Mr. Gonzalez received were 'attributable to the accident, that they were necessary and that the charges for such services were reasonable.' " Hettinga's argument, which is not well developed, appears to encompass past medical expenses that were incurred in the immediate aftermath of the accident as well as future medical expenses.

"[A] person injured by another's tortious conduct is entitled to recover the reasonable value of medical care and services reasonably required and attributable to the tort." (*Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 640.) Proof of the cost of

52.

medical treatment and hospitalization alone is insufficient. "It must be shown additionally that the services were attributable to the accident, that they were necessary and that the charges for such services were reasonable." (*Gimbel v. Laramie* (1960) 181 Cal.App.2d 77, 81-82.) In other words, it must be shown that the services were for injuries sustained in the accident, were "reasonably required as a result of" the injuries occasioned by the accident, and that "the amounts charged were reasonable." (*McAllister v. George* (1977) 73 Cal.App.3d 258, 264; *Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 73 [plaintiff must show that "all of the services covered by his bill were made necessary as a result of injuries sustained by [him] in the accident" and that "the charges for the services were reasonable"].)

### (i) Past Medical Expenses

Here, the jury heard directly from Gonzalez that he sustained injuries to his head, nose, gums, chin, legs, pelvis, trachea and back "as a result of" the accident at the dairy. Thereafter, Hortencia Gonzalez also described the treatment Gonzalez received for injuries sustained in the accident. The jury heard that Gonzalez made a claim for payment of workers compensation benefits, Zenith was the insurer for AC Enterprises, and Zenith paid Gonzalez's medical bills. The jury was provided with a detailed accounting of the expenses that Zenith had paid and heard testimony that the total amount paid by Zenith was $881,649.56. Under Labor Code section 4600, subdivision (a), Zenith (on behalf of Gonzalez's employer) is required by law to pay for all medical treatment "that is reasonably required to cure or relieve the injured worker from the effects of the worker's injury." (Lab. Code, § 4600, subd. (a).)

Hettinga states that it "is not contesting the cost of specific treatment modalities, or the reasonableness of the amounts paid for those treatments." Rather, Hettinga contends that "establishing the reasonable cost of care does not prove that the cost was necessitated by the injuries at issue." However, here Zenith was required by law to pay for all medical treatment "that is reasonably required to cure or relieve the injured worker

from the effects of the worker's injury." (Lab. Code § 4600, subd. (a).) Accordingly, the jury could properly infer that Zenith paid $881,649.56 in medical expenses because it was obligated to do so, so as to ensure Gonzalez received all the reasonably necessary treatment for injuries sustained in the accident at the dairy. The requirements of *Gimbel v. Laramie, supra*, 181 Cal.App.2d at pages 81 to 82; *McAllister v. George*, *supra*, 73 Cal.App.3d at page 264; and *Calhoun v. Hildebrandt*, *supra*, 230 Cal.App.2d at page 73 are thus satisfied here.

Under these circumstances, a showing of negligence and proximate cause would suffice to establish a claim for reimbursement of workers compensation payments made for Gonzalez's medical treatment on account of the accident. (See Lab. Code, § 3854; see also *Breese v. Price* (1981) 29 Cal.3d 923, 931 ["employer [or carrier] seeking reimbursement for compensation payments bears the burden of establishing that a defendant's negligence is the proximate cause of an employee's injuries and the amount of tort damages reasonably resulting therefrom"].) As discussed above, the record contains sufficient evidence to establish negligence and proximate cause. Nonsuit for failure to establish damages for past medical expenses is therefore not warranted.

### (ii) Future Medical Expenses

Civil Code section 3283 provides, "Damages may be awarded … for detriment … certain to result in the future." "Courts have interpreted this section to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur." (*Garcia v. Duro Dyne Corp*. (2007) 156 Cal.App.4th 92, 97 (*Garcia*).) Thus, " '[a]n injured plaintiff is entitled to recover the reasonable value of medical services that are reasonably certain to be necessary in the future.' " (*J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 341 (*J.P.*).) "While there is no clearly established definition of 'reasonable certainty,' evidence of future detriment has been held sufficient based on expert medical opinion which considered the plaintiff's particular circumstances and the expert's experience with similar cases." (*Bihun v. AT & T Information Systems, Inc*.

54.

(1993) 13 Cal.App.4th 976, 995, disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664; see *J.P., supra,* 232 Cal.App.4th at p. 343, citing *Garcia, supra*, 156 Cal.App.4th at pp. 97-98 ["An award of future medical expenses requires reasonable certainty, which can be based on lay testimony, expert testimony, or a combination of the two."].)

"It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case." (*Garcia, supra*, 156 Cal.App.4th at p. 97.) "It is 'not required' for a doctor to 'testify that he [is] reasonably certain that the plaintiff would be disabled in the future. All that is required to establish future disability is that from all the evidence, including expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty.' " (*Id.* at pp. 97-98.) "The fact that the amount of future damages may be difficult to measure or subject to various possible contingencies does not bar recovery." (*Id.* at p. 98.)

Awards of future damages have been upheld (1) where plaintiff's expert testified it was "reasonable to assume" plaintiff would have trouble with the injured parts of his body in the future, but he did not know how much, and he thought the changes in plaintiff's body would " 'build up as age takes place and he is apt to have some trouble' " (*Ostertag v. Bethlehem Shipbuilding Corp*. (1944) 65 Cal.App.2d 795, 806; (2) where plaintiff was still experiencing pain two years after the accident and a doctor testified, " '[f]requently in this type of neck injury a patient will continue to have symptoms indefinitely' and '[i]t may last forever[,] it may [be] as he gets older [that] it may get worse [or] he may improve somewhat" (*Guerra v. Balestieri* (1954) 127 Cal.App.2d 511, 518-519); and (3) where plaintiff's treating physician testified the plaintiff was "very likely" to have some permanent damage and "we might get" traumatic epilepsy as a result of her skull fracture, "but nobody knows, except for time, and time will only tell what will come here" (*Riggs v. Gasser Motors* (1937) 22 Cal.App.2d 636, 643, italics omitted).

"Where the *fact* of damages is certain [as defined above], the amount of damages need not be calculated with absolute certainty." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873.) " '[A] reasonably approximate estimation is deemed to be sufficient, and the existence of a satisfactory method of achieving this estimation will preclude the defendant, whose wrongful act gave rise to the plaintiff's injury, from complaining that the amount of future damages cannot be determined with mathematical precision.' " (*Southern California Disinfecting Co. v. Lomkin* (1960) 183 Cal.App.2d 431, 450.)

Here, Dr. Christopher Stephenson reviewed thousands of pages of Gonzalez's medical records, conducted a detailed interview of Gonzalez, performed a physical examination of Gonzalez, and prepared a report in the case. Dr. Stephenson assessed physical and mental limitations that he attributed to the accident, including, "robust overgrowth of bone" in Gonzalez's hip joint (heterotropic ossification), multi-factorial backpain, post-traumatic amnesia, microscopic and macroscopic changes to brain structure that caused PTSD and anxiety, oculovestibular dysfunction (impaired vision and balance), and a sleep disorder. Dr. Stephenson testified concerning Gonzalez's future medical care. As for Gonzalez's brain injury, Dr. Stephenson observed: "This is a brain injury that is going to affect him and affect him globally for the rest of his life." He added: "So his brain is now wired and works differently than it did before this injury." Drawing on his work on the case and on his experience in this area, Dr. Stephenson generated a life care plan outlining future care based on injuries sustained in the accident and the expected consequences of the accident. Dr. Stephenson expected "somebody with … those injuries," including brain trauma and musculoskeletal injuries, to have problems, not least of which was significant cognitive decline, over time. Accordingly, Gonzalez would need to see various medical professionals over his lifespan, such as a physiatrist, a neurologist, and a pain management specialist (for hip and back pain), as well as undergo periodic tests and interventions (such as injections and other procedures).

Kelly Nasser, "a nurse practitioner in gerontology," with a "certified nurse life care planning certification," testified about the "reasonable cost" of the services encompassed in the life care plan generated by Dr. Stephenson.

Diomaris Safi, Psy.D., a neuropsychologist, reviewed Gonzalez's "extensive" medical records (82 sets of records); interviewed and evaluated him; and prepared a report. She testified that Gonzalez presented a complex case: "When you're talking about a head injury, especially kind of a complex or head injury, those variables are a lot more complex. So we have not only the anxiety, but there's also the orthopedic injuries. Often there is pain. There is also, um, other psychiatric issues that are also associated with the head injury. So it makes it more complex."

Safi diagnosed Gonzalez with major depressive disorder associated with his 2017 traumatic brain injury. Safi testified Gonzalez's depressive disorder was "single episode." She explained what this meant: "We're not talking about someone that has recurrent depression, which would be someone that had a significant history of depression and now is having another episode. This is someone that has, um, depression that can be associated with something that happened to them." She added that the most likely trigger for Gonzalez's depression was the traumatic brain injury he sustained in 2017. Safi also diagnosed Gonzalez with a mild neurocognitive disorder at present. However, Gonzalez was at a "significant[ly]" higher risk of developing further decline, that is, getting major cognitive disorder or dementia in the future, as a result of his injuries from the accident. Consequently, it was more likely than not that Gonzalez would continue to have cognitive decline in the future, along with anxiety and depressive disorders. Safi testified that Gonzalez's condition "warrants monitoring and follow-up testing," as well as ongoing psychotherapy.

This evidence (that is, the testimony of Dr. Stephenson, Kelly Nasser, and Diomaris Safi), along with the testimony of Gonzalez and his family members as to his ongoing pain and other problems, was sufficient for a jury to conclude that it is

reasonably certain that Gonzalez will require future medical services necessitated by the injuries sustained in the accident and to assess the reasonable value of those services. Nonsuit is not warranted on grounds of failure to establish future medical damages.

## **DISPOSITION**

The judgment of nonsuit is reversed and the matter is remanded for the trial court to conduct a new trial. Plaintiffs and intervenor are awarded their costs on appeal.

SMITH, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

DE SANTOS, J.